**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION NO. 3:14CV-00363-JHM**

**HELANE MILLER**                                                                                        **PLAINTIFF**

**VS.**

**ABBOTT LABORATORIES**                                                                    **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion by Defendant, Abbott Laboratories, for summary judgment [DN 40]. Fully briefed, this matter is ripe for decision.

**I.  STANDARD OF REVIEW**

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U .S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to

particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard the Court reviews the following facts.

## II. BACKGROUND

Plaintiff, Helane Miller ("Miller"), worked for Defendant, Abbott Laboratories ("Abbott"), for over 10 years. In September of 1999, Miller began working at Abbott in its Managed Care Division as a Senior Regional Account Executive. As a Senior Regional Account Executive, Abbott awarded Miller the title of "Rising Star" in 2000 and the title of "All Star" in 2001, 2002, 2003, and 2007. From 2000 to 2008, Abbott ranked Miller in the top 5% of the Managed Care Sales Force division. In November of 2008, Abbott laid off approximately 750 employees, including Miller.

In December 2009, Abbott re-hired Miller as a Sales Excellence Manager within its Pharmaceutical Product Division. A major portion of Miller's responsibilities in that position included identifying potential ethical violations within the company. In January of 2011, Abbott again underwent significant downsizing, eliminating approximately 2,000 employees, including Miller. In November 2011, Abbott again re-hired Miller as a Therapeutic Nutrition Specialist. District Manager Bridget Bailey served as Miller's supervisor. Bailey reported to Laurence Carbone, Divisional Vice President of Sales for Pediatric, Home Health, and Oncology.

In October 2012, Bailey created a competition for employees within her division to submit written protocols. The employee who submitted the best protocol would receive $100. A protocol is an exclusivity agreement between Abbott and a health service provider whereby the

health services provider agrees to provide its patients samples and coupons for Abbott products. During the competition, Miller learned that another Therapeutic Nutrition Account Manager, Tom Berry, stated to Karen Curl-Stepney with the Evangelical Home of Michigan that "[i]f you write the best protocol, I'll split the $100 bonus with you." Miller reported the bribe to Bailey. Miller alleges that she urged Bailey not to involve her supervisor Carbone, but instead, pursuant to the Office of Ethics and Compliance ("OEC") policy, Miller was required to report the information. Bailey instructed Miller not to contact the OEC, and Bailey instead contacted Carbone.

On October 3, 2012, Miller alleges that she informed the OEC about Berry's $50 bribe, Bailey's insistence that Miller not report the bribe to the OEC, and Bailey's decision to conduct her own internal investigation. According to Miller, she reported Berry's bribe based on her training on the False Claims Act, the Anti-Kickback Statute, and her belief that Abbott was violating a 2012 Corporate Integrity Agreement ("CIA").[1] On October 4, 2012, Bailey called Curl-Stepney and asked about her contact with Berry. Curl-Stepney told Bailey that "Tom's comments were probably in jest." On October 5, 2012, Bailey talked with Berry, and he denied any wrongdoing. In December of 2012, the OEC concluded its investigation and determined that it would take no action against Berry, but required Bailey to complete formal OEC training and placed a written report in Bailey's personnel file for inappropriately disclosing Miller's disclosure of Berry's bribe and initiating her own investigation.

Miller alleges that following her disclosure of Berry's bribe to the OEC, Bailey informed the hiring manager of Abbott's pharmaceutical arm, AbbVie, about Miller's report of Berry. Additionally, while Bailey indicated in Miller's 2012 annual performance evaluation that Miller

---

[1] According to Plaintiff, in May 2012, Abbott paid $1.5 billion to resolve criminal and civil investigations into its off-label promotion of Depakote. As a result, Abbott entered into a five year Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services.

3

was "Achieving Expectations," Miller noticed Bailey's demeanor toward her shift. Miller states that Bailey refused to let her roll over her vacation hours as previously discussed; screamed at her in January of 2013; refused to provide training to Bailey on tube feeding on at least three occasions; screamed at her in front of other employees in May of 2013 while not reprimanding other similar employees; threatened that she needed to either retire or be fired; incorrectly indicated in a warning memo issued on June 28, 2013 that Miller had secured no protocols; failed to place Miller on a formal PIP before terminating her; and terminated Miller even after Miller had formally announced her intention to retire.

In contrast, Abbott represents that Miller was terminated in September of 2013 as a result of her deteriorating performance. Miller failed two certification tests in February 2013 that were administered to all sales representatives. On retest, Miller passed the Business Review Deck Evaluations test in March of 2013. However, Miller failed the Objection Handling Certification a total of three times. Abbott claims that Miller failed to complete essential pre-work for a meeting held in May of 2013 and failed to complete other assignments in June of 2013. On June 28, 2013, Bailey issued a Performance Expectations Coaching Memo to Miller discussing her lack of preparation for meetings and training, failure to follow up with protocols, lack of knowledge of the business, lack of production knowledge, and failure to use good judgment. On August 25, 2013, Bailey informed Miller that she would be putting her on a PIP. However, after discussing it further, Bailey, Carbone, and Colleen Plettinck, Abbott's Senior Specialist for Employee Relations, decided that termination was appropriate given Miller's repeated failure to pass a required certification, poor performance, and her lack of will and desire to perform well. Cindy Foster of the Business Human Resource Department and Jerry Hutchinson, Divisional Vice President of Human Resources also approved the termination in late August of 2013. On

September 5, 2013, Miller informed Bailey and Carbone that she had decided to retire with a retirement date of October 31, 2013. Abbott terminated Miller's employment on September 9, 2013.

In May of 2014, Miller filed suit against Abbott Laboratories alleging (1) retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), (2) wrongful discharge in violation of KRS § 205.8461, and (3) retaliation in violation of Section 828 of the National Defense Authorization Act, 41 U.S.C. § 4712. Abbott now moves for summary judgment arguing that Miller's False Claims Act retaliation claim fails as a matter of law because Miller cannot establish a *prima facie* case of retaliation or that Abbott's reasons for its adverse actions were pretextual. Additionally, Abbott argues that Miller's wrongful discharge claim under Kentucky common law is preempted by Kentucky's statutory anti-retaliation provision contained in KRS § 205.8465. Finally, Abbott asserts that Miller's National Defense Authorization Act ("NDAA") claim fails because it is premised on an alleged violation of an agreement between Abbott and the federal government that was not in effect when the $50 allegedly was offered and whose terms have no relation to any of Miller's allegations.

### III. DISCUSSION

**A. False Claims Act**

Plaintiff's first cause of action is for retaliation under the False Claims Act, 31 U.S.C. § 3730(h) "The False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, has been the federal government's primary tool for combatting fraud perpetrated against it for over 150 years. In addition to providing the federal government with the means to prosecute fraud, the FCA also allows private citizens to initiate *qui tam* lawsuits on the government's behalf, thus increasing the exposure of those who commit fraud." Arthurs v. Global TPA LLC, 2015 WL 1349986, *3

(M.D. Fla. March 25, 2015)(citing 31 U.S.C. § 3730). "Because employees naturally became a primary source of *qui tam* litigation due to their insider status, Congress amended the FCA in 1986 to protect employees who investigate or help investigate potential fraud from the retaliatory acts of their employers." Id.

To establish a claim for retaliatory discharge under 31 U.S.C. § 3730(h) of the FCA, Plaintiff must prove that he engaged in a protected activity, his employer knew that he engaged in the protected activity, and his employer discharged or otherwise discriminated against the employee as a result of the protected activity. Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 566 (6th Cir. 2003) (citing McKenzie v. BellSouth Telecomms., Inc., 219 F.3d 508, 513–14 (6th Cir. 2000)).

FCA retaliation claims are evaluated under the McDonnell–Douglas burden-shifting framework. Scott v. Metro. Health Corp., 234 Fed. Appx. 341, 346 (6th Cir. 2007)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)). To establish a prima facie case, a plaintiff must prove that: (1) she engaged in a protected activity; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Scott v. Metropolitan Health Corp., 234 Fed. Appx. 341, 346 (6th Cir. 2007); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000). If and when a plaintiff has established a *prima facie* case, the burden of production once again shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. If the employer carries that burden, the plaintiff bears the burden of demonstrating that the employer's reason is pretextual. Id.; see also Mikhaeil v. Walgreens Inc., 2015 WL 778179, *6 (E.D. Mich. Feb. 24, 2015)(citing Scott, 234

Fed. Appx. at 346). Abbott maintains that Miller has not raised a genuine issue of material fact as to her *prima facie* case or as to pretext.

### 1. Prima Facie Case

Abbott moves for summary judgment arguing that Miller's FCA retaliation claim fails as a matter of law because Miller cannot establish a *prima facie* case of retaliation. Specifically, Abbott maintains that there is no genuine issue of material fact that by reporting to Abbott a joking offer by Berry to pay $50, Miller was acting in furtherance of a FCA action or to stop a violation of the FCA, or that Abbott knew of any conduct protected by the FCA when investigating the claim. Further, Abbott contends that there is no causal connection between Miller's report and her employment termination 11 months later.

#### a. Protected Activity

Abbott claims that Miller has failed to establish that she engaged in any protected activity under the FCA. Miller argues that her reports to Bailey and the OEC constitute protected activity under the FCA because her reports were in furtherance of an effort to stop a violation of the FCA. Miller states that she reasonably believed that Berry's bribe could be a violation of the FCA or the Federal Anti-Kickback Statute ("AKS"). According to Miller, Abbot indirectly sells its products to customers through securing protocols with Home Health Agencies ("HHA"). Many of the HHA's, including Karen Curl-Stepney's Evangelical Home of Michigan, have customers who purchase Abbott's products using Medicare. Miller testified that she is familiar with the FCA and AKS noting that Abbott's own Code of Business Conduct provides that

> [w]hile Abbott does not itself submit claims to insurance programs like Medicare and Medicaid, many of our customers do. We must avoid any conduct that could lead customers to submit false claims by following procedures carefully designed to ensure that any information we provide to customers about Medicare or Medicaid reimbursement for our products is accurate and otherwise proper.

7

(Helane Miller Dep., Ex 6 AMILLER000394). Further, Abbott's Code of Conduct also provides that the Federal Anti-Kickback Statute "generally prohibits offering or paying . . . cash or other benefits to induce the purchase, order, or recommendation of products eligible for payment by a Federal Health Care Program." Id. Miller contends that even if Abbott does not directly make a false claim, it could be liable under the FCA if it causes a false claim to be made by one of its customers.

> As originally codified, the 1986 anti-retaliation provision of the FCA stated:
>
>> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under [the FCA], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2006).

In 2009, Congress amended § 3730 "to broaden the protection afforded to those who take action to thwart fraud committed against the federal government." Arthurs, 2015 WL 1349986, *3. The FCA's anti-retaliation provision now reads as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1) (2013). "Importantly, Congress expanded both the category of persons protected by the FCA to include contractors and agents in addition to employees and the category of protected conduct to include non-litigation activities taken to stop a violation of the

8

FCA." Arthurs, 2015 WL 1349986, * 3.

As a result of this amendment, the FCA "now 'protects two categories of conduct.'" Tibor v. Michigan Orthopaedic Inst., 2014 WL 6871320, *2 (E.D. Mich. Dec.5, 2014)(quoting Halasa v. ITT Educ. Services, Inc., 690 F.3d 844, 847 (7th Cir. 2012)). "In addition to protecting lawful acts taken in furtherance of an action under the FCA, it now also protects 'employees from being fired for undertaking other efforts to stop violations of the Act, such as reporting suspected misconduct to internal supervisors.'" Mikhaeil, 2015 WL 778179, *7 (quoting Halasa, 690 F.3d at 847–48; see also 155 Cong. Rec. E1295–03, E1300, 2009 WL 1544226 (daily ed. June 3, 2009) (statement of Rep. Berman) ("This language is intended to make clear that [§ 3730(h) ] protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.")). See also Jones-McNamara v. Holzer Health Systems, Inc., 2014 WL 1671495, *5 (S.D. Ohio April 28, 2014)(stating that protected activity can "take the form of trying to stop the misconduct by external means (e.g., an FCA action) or by internal means (e.g., reporting violations up a company's chain of command in an effort to effectuate institutional course correction)").

The district court in Mikhaeil v. Walgreens, Inc. summarized the Sixth Circuit case law on the FCA's protection of internal reports of fraud in light of the amendments of § 3730(h):

> Although the Sixth Circuit (and others) have previously recognized that internal reports of fraud, such as Plaintiff's, can qualify as protected activity, see McKenzie, 219 F.3d at 516, in protecting "other efforts," the amendment makes clear that this interpretation is correct. An internal report to a supervisor is undoubtably an "effort." See Webster's Third New International Dictionary 725 (1986) (defining "effort" as "expenditure of energy toward a particular end.") To be protected, however, the internal

9

> report must "specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct." Guerrero v. Total Renal Care, Inc., No. 11–449, 2012 WL 2237689, at *5 (W.D. Tex. Mar. 12, 2012); see also U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 743 (D.C. Cir. 1998) ("Merely grumbling to the employer about job dissatisfaction or regulatory violations does not . . . constitute protected activity . . . .") (interpreting the pre-amendment FCA). This is because the amendment requires a plaintiff to prove that she engaged in "other efforts to stop 1 or more violations of this subsection." 31 U.S.C. § 3730(h)(1) (emphasis added). There still must be some nexus between the report and "exposing fraud." McKenzie, 219 F.3d at 517. What the amendment has removed is the requirement that a protected activity be "in furtherance of an action under this section." Therefore, statements from decisions requiring protected conduct to "reasonably lead[ ] to a viable FCA action," McKenzie, 219 F.3d at 517, or to give the employer reason to believe that FCA litigation was a "distinct possibility," Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 188 (3d Cir. 2001), are likely no longer correct. Nevertheless, these decisions generally took a broad view of protected activity and would already find an employee's internal reports to a supervisor protected if they alleged fraud on the government. See McKenzie, 219 F.3d at 516 ("Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government.").

Mikhaeil, 2015 WL 778179, *7. Thus, the § 3730(h) amendments expand protected activity beyond filed *qui tam* actions or viable FCA claims to include internal reports of fraud on the government.

Accordingly, in light of the above case law, the Court finds that Plaintiff has not presented sufficient evidence to establish that she engaged in protected activity. Miller failed to establish a nexus or link between the report of the bribe and exposing fraud on the government. Miller did not inform Bailey or the OEC that Abbott was possibly engaged in fraud on the government, a violation of the False Claims Act, or Anti-Kickback Statute. Instead, Miller reported one instance of general misconduct by Berry. Miller informed Bailey that Berry offered Curl-Stepney half the bonus of $50.00 if she drafted a protocol for him and he won the protocol

contest. Further, despite Miller's argument to the contrary, Miller had no reason to believe that Berry's alleged bribe would lead to fraud on the Government. See Thompson v. Quorum Health Res., LLC, 2010 WL 234801, at *3 (W.D. Ky. Jan.13, 2010) (stating that, to prove he was engaged in protected activity, the plaintiff had to show that "a reasonable person in [his] position would have believed that the employer was possibility committing fraud against the government"); Mcfeeters v. Northwest Hospital, LLC, 2015 WL 328212, *6 (M.D. Tenn. Jan. 23, 2015) (citing Smith v. C.R. Bard, Inc., 730 F.Supp.2d 783, 801 (M.D.Tenn.2010)). In fact, Miller testified that she understood from Curl-Stepney's perspective that the bribe "was not going to ever take place." (Miller Dep. at 252.) Miller further testified that at the time she reported it to Bailey and the OEC, she had no concern that "it was actually going to be carried through." (Id.) Miller acknowledged that when she spoke with an investigator at the OEC in December of 2012, she indicated that Curl-Stepney had indicated that Berry "had made joke" about splitting the prize if she drafted a protocol and Berry won the contest. (Id. at 300.) Despite her representations now, Miller's internal reports of Berry's alleged bribe were not directed at notifying Bailey or the OEC that Abbott was engaged in fraud on the federal government.

As discussed above, to constitute protected activity, Miller's report "must specifically allege fraud on the government, and not just general misconduct." Farmer v. Eagle Systems and Services, Inc., 2015 WL 134019, *3 (E.D. N.C. Jan. 9, 2015; Mikhaeil, 2015 WL 778179, *7. In the present case, Miller's internal reports merely alleged general misconduct by an employee at Abbott. Because § 3730(h) requires more than merely reporting wrongdoing to supervisors, Miller has not presented sufficient evidence to show that she was engaged in protected activity. For these reasons, the Court concludes Miller has failed to present sufficient evidence to

maintain her FCA claim for retaliation, and therefore, summary judgment on this claim is granted.

### B. NDAA Claim

The National Defense Authorization Act provides that "[a]n employee of a contractor, subcontractor, or grantee may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing" to a covered person or body "information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant." 41 U.S.C. § 4712(a)(1). A covered person or body includes "[a] management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2)(G).

In support of her NDAA claim, Miller alleges the she engaged in protected conduct when she told the OEC about Berry's $50 bribe, Bailey's insistence that Miller not report the bribe to the OEC, and Bailey's decision to conduct her own internal investigation regarding Berry's bribe. Miller argues that the conduct she observed and disclosed constituted a violation of the Corporate Integrity Agreement ("CIA") entered into between Abbott and the Department of Health and Human Services ("DHHS") in May of 2012.

To prevail on her retaliation claim under the NDAA, Miller must prove that (1) she is an employee of a government contractor, (2) she has information that she reasonably believes is evidence of "a violation of law, rule, or regulation related to a Federal contract . . . or grant," and (3) that her protected activity was a contributing factor in the employer's decision to take an

12

adverse employment action. 41 U.S.C. § 4712. See also Whistleblower Litigation, American Law Institute American Bar Association Continuing Legal Education, SV037 ALI-ABA 1407, *1478 (2014).

      Miller's NDAA claim fails as a matter of law because Miller admitted in her deposition that the CIA did not go into effect until October 11, 2012, after Miller's report of the alleged bribe (Miller Dep. at 226) and the CIA did not apply to Miller, Berry, or Bailey as employees of Abbott Nutrition (Id. at 197). First, Abbott tendered the declaration of Jerry Hutchinson, Abbott Laboratories Divisional Vice President of Human Resources, in which he averred that the effective date of the CIA was October 11, 2012. (Jerry Hutchinson Declaration at ¶ 8.) An email from Jeff at PPD US Information to Kristin Schriver discussing the CIA further supports Abbott's statement that the CIA became effective on October 11, 2012. (Miller Dep., Exhibit 18.)

      Second, Miller testified that she knew at the time she reported Berry's alleged bribe to Abbott that the CIA was not relevant to the investigation because it did not apply to Abbott Nutrition. Miller acknowledged that the CIA covered only work that U.S. Pharmaceutical Products Group (PPG) did regarding research-based pharmaceutical products and that Abbott Nutrition sales representatives did not promote research-based pharmaceutical products. (Miller Dep. at 226, 365-366.) Thus, Miller's admissions in her deposition prevent her from now making the argument that she "reasonably believed" the CIA was at risk of being violated when she made her report.

      For these reasons, the Court finds that summary judgment on Miller's NDAA retaliation claim is appropriate.

    **C. State Law Claim**

Having dismissed the Plaintiff's federal claims, the Court declines to exercise pendent jurisdiction over Plaintiff's state law claim. See United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." Id. at 726.). Therefore, Plaintiff's pendent state law claim is dismissed without prejudice.

### IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the motion by Defendant, Abbott Laboratories, for summary judgment [DN 40] is **GRANTED**. Plaintiff's federal claims are dismissed with prejudice. Plaintiff's state law claim is dismissed without prejudice. A Judgment will be entered consistent with this Opinion.

cc: counsel of record

                **Joseph H. McKinley, Jr., Chief Judge**
                **United States District Court**

June 17, 2015